# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

DANIEL GOLODNER,                    :
        Plaintiff,                    :
                         :

V.                                  :     3:08-cv-1319 (WWE)
                         :

CITY OF NEW LONDON, TODD            :
BERGESON, GENARO VELEZ,             :
PATRICIA TIDD, DEANNA NOTT,         :
OFFICER CARTER, MARGARET            :
ACKLEY, OFFICER GARNET,             :
Badge No. 551,                      :
          Defendants.               :

## MEMORANDUM OF DECISION ON
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This action arises from plaintiff Daniel Golodner's claims that defendants City of New London, Todd Bergeson, Genaro Velez, Patricia Tidd, Deanna Nott, Officer Raheem Carter,[1] Margaret Ackley and Officer Darwin Garnett,[2] Badge No. 551, violated his rights guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution. Now pending before the Court is defendants' Motion for Summary Judgment (Doc. #36). For the following reasons, the motion will be granted.

The Court has jurisdiction over plaintiff's claims pursuant to 28 U.S.C. § 1331.

## BACKGROUND

The parties have submitted memoranda, stipulations of fact and supporting exhibits, which reflect the following factual background.

---

[1]     Officer Carter died on April 13, 2007 (Doc. #22).

[2]     Officer Garnett's name is spelled "Garnett." The complaint spells his name as "Garnet." The Court will use the proper spelling throughout this ruling.

This action, commenced on August 29, 2008, stems from an ongoing series of disputes between plaintiff and his neighbors and the police response to those disputes.

The story of this case begins with two civilian complaints made by plaintiff against New London Police Department ("NLPD") Officer William Edwards.

Plaintiff Daniel Golodner has resided at 95 Colman Street in New London, Connecticut since November 2001.

## I.      Plaintiff's Civilian Complaints

On August 6, 2001, plaintiff made a citizen's complaint against Officer William Edwards.  On September 18, NLPD Chief Rinehart sent plaintiff a letter regarding the NLPD's investigation into the complaint and informing plaintiff that an investigation had found his complaint "unfounded."  Chief Rinehart also told plaintiff of his right to appeal. Plaintiff did not file any appeal.

On January 22, 2003, plaintiff made another citizen's complaint against Officer Edwards regarding a parking ticket issued to plaintiff's apprentice, John Connolly.  On May 12, Chief Rinehart sent plaintiff a letter telling him that an investigation found this second complaint to be "unfounded" and informing plaintiff of his right to appeal. Plaintiff again did not appeal.

Plaintiff claims that numerous individuals within the NLPD, including Captain Michael Lacey, Captain Kenneth Edwards, Deputy Police Chief Gavitt and Chief Rinehart, were made aware of these complaints and that these individuals did not take any action on plaintiff's complaint.  Plaintiff further claims that the police chief refused to meet with plaintiff.

Plaintiff averred that he continued to complain about police misconduct and

2

mistreatment from 2004 to 2008 to Captains Michael Edwards, Dittman and Lacey, none of whom took any action. Plaintiff was also referred to Captain Kenneth Edwards[3] even though he is Officer William Edwards' brother.

Plaintiff further averred that he complained to City of New London Council Members Rob Pero, John Russell, Wade Hyslop and Meg Curtain as well as past and present Mayors Rob Pero and Wade Hyslop. On March 19, 2009, plaintiff attempted to complain to City Manager Martin Berliner who told plaintiff to summarize his complaint in a letter to him. Plaintiff did so, but then Berliner refused to see plaintiff. Hyslop told plaintiff in September 2009 that City Manager Berliner had told Hyslop that it was unlawful for Hyslop to speak to him because of this pending suit.

## II.     Plaintiff's Interactions with His Neighbors

Do good fences indeed make good neighbors? Or do they simply separate individuals. Robert Frost's poem indicates that fences divide and separate; they do not bring peace. See Robert Frost, Mending Wall (1914), available at http://writing.upenn.edu/~afilreis/88/frost-mending.html. This case, on some level, supports Frost's view as the facts arise from a dispute about a fence. On one side of the wall was plaintiff. On the other side of the wall were the Cordero and Pellot families.

Next door to plaintiff's house is a two-family house; the first floor apartment is 91 Colman Street while the second floor apartment is 93 Colman Street. Antonia Cordero lived in the first floor apartment at 91 Colman Street with her son Ricky Cordero and

---

[3]      It is unclear based on the record whether Kenneth Edwards is an officer or captain in the NLPD.

granddaughter Jeannette Ortiz. Antonia Cordero's daughter, Margie Pellot, lived in the second floor apartment with her sons Eric and Jose Pellot. None of these individuals are parties to this litigation.

> **A.    November 17, 2004 Incident and the Tale of the Fence**

On November 17, 2004, plaintiff's house guest, Emma McNeil knocked down a portion of the fence, owned by the Pellot/Cordero family, located between 91/93 Colman Street and 95 Colman Street. Golodner claims that McNeil accidentally hit the fence. After McNeil hit the fence, there was a verbal altercation between members of the Pellot/Cordero family and McNeil and plaintiff. Officers De La Cruz and Morales of the NLPD were called to respond to 93 Colman Street. Plaintiff and Margie Pellot were issued a summons and charged with Disorderly Conduct; Jose Pellot was issued a summons and charged with Breach of Peace.

Following the incident, plaintiff conducted an investigation regarding the fences around the Pellot/Cordero property because he believed that the fences did not comply with the City of New London's zoning regulations. On February 24, 2005, plaintiff sent a letter to Margie Pellot regarding the fences, in which he stated that if Margie Pellot did not respond to the letter, he would file a complaint with the City about the fences. Margie Pellot did not respond to the February 24 letter. On April 27, 2005, plaintiff filed a civil complaint in Connecticut Superior Court in New London against Margie Pellot and Antonia Cordero alleging claims of negligence, trespass and malicious erection of a structure.

On May 17, 2006, City of New London Zoning Enforcement Officer Michelle Greiner wrote Margie Pellot and Antoina Cordero informing them that a complaint had

4

been received by the City of New London Office of Development & Planning regarding the fences.

On September 27, 2006, Superior Court Judge Hendel informed plaintiff that the City of New London was responsible for enforcing its zoning laws and that he should withdraw his lawsuit against Margie Pellot and Antonia Cordero. In November, City of New London traffic officer Graham Mugover went to 95 Colman Street to investigate the fence. On November 13, Mugovero sent an email to NLPD Officer Kenneth Edwards regarding the fence. Officer Kenneth Edwards forwarded the email to Zoning Enforcement Officer Greiner stating, "As you can see, while not a terribly hazardous situation, there is some reasons for concern for pedestrians." Greiner then sent an email to Margie Pellot and Antonia Cordero regarding the fence in which she stated, "As you know, Mr. Daniel Golodner has expressed concern that he cannot safely exit his driveway due to the location of the fence.... [T]he City's traffic officer concurs with Mr. Golodner's concerns."

**B.     April 25, 2006 Incident**

On April 25, 2006, plaintiff contacted the NLPD to complain that Jose Pellot, a/k/a "Tony," was using foul language and scaring plaintiff's daughter. Non-defendant NLPD Officer William Edwards responded to plaintiff's address and took a sworn statement from him. Officer Edwards concluded that there was no probable cause to support an arrest, and neither plaintiff nor Jose Pellot was arrested that day.

**C.     May 18 and 24, 2006 Incidents**

On May 18, 2006, Ricky Cordero called the NLPD and complained that plaintiff

had called him a "Spanish nigger."  At 3:53 p.m., defendants NLPD Officers Garnett and Carter responded to 91 Colman to investigate the complaint.  The officers obtained a sworn statement from Ricky Cordero.  In his statement, Cordero complained of threatening and harassing behavior by Golodner for the previous year.  Cordero further wrote that his family felt "degraded" and "belittle[d]."  Further, according to Cordero, his family felt threatened by Golodner and was afraid to leave Cordero's elderly mother home alone.

Officers Garnett and Carter also spoke to plaintiff.  Plaintiff told the officers that he had a witness who would be willing to provide a statement.  Officer Carter gave plaintiff a phone number for the NLPD and told plaintiff to contact them.  The officers also told plaintiff that his witness could contact them regarding the complaint.  The officers refused to give the phone numbers to their direct voicemails.  Plaintiff did not call the officers.  He said at his deposition, however, that his witness, Keith, had called twice and left messages for the officers, but that they never called him back.

At 11:15 a.m. on May 24, 2006, defendant Officer Deana Nott was dispatched to 17 Colman Street because of a disturbance between plaintiff and Ricky Cordero.  Ricky Cordero had been traveling on Colman Street in a rental vehicle and plaintiff was traveling directly behind him in his van.  According to the statement that Cordero gave to police, plaintiff was driving directly behind Cordero when Cordero began to brake.  Plaintiff came close to rear-ending Cordero.  Cordero claimed that plaintiff punched him in the "eye, jaw and lip."  Officer Nott observed blood on Cordero's lip.  Plaintiff did not provide a sworn statement because, he claims, Nott refused to take one, telling plaintiff that he could not provide one because he was not a victim.  Nott interviewed a witness

6

who corroborated Cordero's story, but did not provide a sworn statement. As a result of the incident, plaintiff was issued a summons for Breach of Peace and Cordero was issued an infraction for obstruction of the roadway. Plaintiff was permitted to leave the scene on a promise to appear and was not taken into custody on May 24.

On May 25, Officer Carter applied for a warrant for plaintiff's arrest based on the May 18 and 24 incidents. The arrest warrant was signed by Superior Court Judge Hilary B. Strackbein on June 7. On June 10, plaintiff turned himself in to the NLPD and was charged with Intimidation Based on Bias or Bigotry in violation of Connecticut General Statutes § 53a-181k.

### D.    June 30, 2006 Incident

On June 30, 2006, at approximately 8:54 a.m., non-defendant NLPD Officer Chad Stringer responded to 91 Colman Street to investigate a report of a neighbor dispute. Officer Stringer reported that he met with Jose Pellot upon his arrival. Pellot informed Officer Stringer that there was an ongoing dispute between plaintiff and the Pellot family. Pellot told Officer Stringer that while he was in his backyard that morning, plaintiff was in his own backyard "flipping his middle finger" at Pellot. Officer Stringer did not speak to plaintiff at that time because he was not home.

At approximately 10:06 a.m., Officer Stringer went to 95 Colman Street to speak to plaintiff. Plaintiff informed Officer Stringer that he had a video of Pellot harassing him. Officer Stringer viewed plaintiff's video and concluded that there was no probable cause to arrest either plaintiff or Pellot at that time.

### E. September 26, 2006 Arrest

On September 26, 2006, at approximately 9:34 a.m., plaintiff telephoned the NLPD because he had observed Margie Pellot digging up a merestone[4] in his backyard. Non-defendant NLPD Officers Lawrence Keating and Russell Cavanaugh responded to the call. Pellot denied moving the stone marker. Plaintiff told the officers that there was an ongoing dispute and that the parties were going to court the next day. The officers found no probable cause and did not arrest either plaintiff or Pellot.

Later that day, at approximately 4:00 p.m., NLPD Officers Todd Bergeson, Christopher Kramer and Max Bertsch responded to 91 and 95 Colman Street to investigate a disturbance. Plaintiff told police that while he was taking measurements of his driveway, Antonia Cordero came out onto her porch, began yelling at him in Spanish and threw a folding law chair at him which struck him. A witness to this incident, Michael Capone, gave a sworn written statement agreeing with plaintiff's description of the events. Cordero also provided a report to police, in which she stated that plaintiff was outside measuring the fence when she told him not to touch her fence. Golodner entered Cordero's property, raised his hand as if it hit her and called her a "bitch" and a "dirty slut." When Cordero thought that Golodner was going to hit her, she threw a chair at him. Golodner then took the chair and left the property. Officer Bergeson spoke with Jose DeJesus who lived across the street from plaintiff. DeJesus stated that he saw plaintiff approach Cordero and saw Cordero throw a lawn chair at plaintiff. As a result of this incident, plaintiff was issued a summons for Disorderly

---

[4] A merestone is a "stone that marks land boundaries." Black's Law Dictionary (9th ed. 2004).

Conduct and Criminal Trespass in the Third Degree, and Cordero was issued a summons for Disorderly Conduct.

### F.     March 7, 2007 Incident

On March 7, 2007, at approximately 12:51 p.m., defendant NLPD Officer Patricia Tidd responded, along with other officers, to the corner of Colman Street and Redden Avenue on a report of two men fighting.  When Officer Tidd arrived, she observed plaintiff sitting on the ground with a bloody mouth and broken glasses.  Plaintiff told Officer Tidd that Jose Pellot had stopped his vehicle at that corner where plaintiff had been standing and began yelling obscenities at plaintiff and threatening him.  Plaintiff also stated that Pellot had spit at him through the car window and that plaintiff had spit back at him.  Plaintiff further stated that Pellot then exited his vehicle and tackled plaintiff, and that they started fighting.  Plaintiff claimed that Margie Pellot was also involved in the fighting.  Plaintiff admitted that he spit at Jose Pellot's vehicle, bit his hand and stuck his thumbs into Pellot's eye sockets.  Plaintiff, Jose Pellot and Wallesca Soto, a witness, all gave sworn statements regarding this incident.  As a result of this incident, both plaintiff and Jose Pellot were issued summonses for Breach of Peace. Plaintiff was not taken into custody.

### G.     April 5, 2007 Incident

On April 5, 2007, at approximately 2:30 p.m., defendant NLPD Officer Genaro Velez responded to a report of a neighbor dispute at 91 Colman Street.  Upon arriving, Officer Velez spoke to Antonia Cordero who told him that earlier that day, while she was checking her mail, plaintiff had "flipped his middle finger at her and at the same time

told her 'fuck you,' called her a 'mother fucker,' a 'fucking bitch,' and a 'Puerto Rican Nigger.'" Cordero provided a sworn written statement restating these assertions. Plaintiff was not home, and Officer Velez left a card at the front and rear doors of plaintiff's residence with a note requesting that he call her as soon as possible. Plaintiff asserts that he was out of the state on April 5.

On April 6, 2007, plaintiff called the NLPD and spoke with defendant Lieutenant Margaret Ackley who told plaintiff to come to the NLPD when he returned to New London. On April 10, plaintiff came into the NLPD and spoke to Officer Velez. Officer Velez reported that plaintiff "appeared to be on edge waiting to spark." According to Officer Velez's report, plaintiff:

> became hostile raising his voice and wanted the police to answer his questions.... He was asked if he wanted to give his side of his story and he stated that the police wasn't conducting any investigation and that we just wanted to arrest him.... He started yelling and raising his arms and was told to keep his hands to his side or he would be placed under arrest.

According to plaintiff, he became angry once Lieutenant Ackley refused to see him. Plaintiff was issued a summons for Disorderly Conduct because of the April 5 incident. Plaintiff was not taken into custody on April 10.

### H.  Aftermath of the Incidents

On December 20, 2007, a jury returned a not guilty verdict on the May 18, 2006 Breach of Peace charge; the May 24, 2006 Breach of Peace charge; the September 26, 2006 Disorderly Conduct and Criminal Trespass in the Third Degree charges; and the March 7, 2007 charge. The May 18 and 24, 2006 Intimidation Based on Bigotry or Bias charge and the April 5, 2007 Disorderly Conduct charge were dismissed and not

submitted to the jury.

## DISCUSSION

A motion for summary judgment must be granted if the pleadings, discovery materials before the court and any affidavits show that there is no genuine issue as to any material fact and it is clear that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).

A dispute regarding a material fact is genuine if there is sufficient evidence that a reasonable jury could return a verdict for the nonmoving party. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The burden is on the moving party to demonstrate the absence of any material factual issue genuinely in dispute. Am. Int'l Group, Inc. v. London Am. Int'l Corp., 664 F.2d 348, 351 (2d Cir. 1981).

If a nonmoving party has failed to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, then summary judgment is appropriate. Celotex Corp., 477 U.S. at 323. If the nonmoving party submits evidence which is "merely colorable," legally sufficient opposition to the motion for summary judgment is not met. Liberty Lobby, 477 U.S. at 24. The mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient; there must be evidence on which the jury could reasonably find for him. See Dawson v. County of Westchester, 373 F.3d 265, 272 (2d Cir. 2004).

On summary judgment, the court resolves all ambiguities and draws all permissible factual inferences in favor of the nonmoving party. See Patterson v. County of Oneida, 375 F.3d 206, 218 (2d Cir. 2004). If there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party

11

on the issue on which summary judgment is sought, summary judgment is improper.

See Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc., 391 F.3d 77, 83 (2d Cir. 2004).

## I.  False Arrest Claims

Plaintiff's first claim is that he was falsely arrested by police on May 18, 2006; May 24, 2006; September 26, 2006; March 7, 2007; and April 5, 2007 and that such arrests violated his rights under 42 U.S.C. § 1983.

The Fourth Amendment to the United States Constitution guarantees that an individual shall not be arrested without probable cause.  Weyant v. Okst, 101 F.3d 845, 852 (2d Cir. 1996).  A claim for false arrest under section 1983 requires plaintiff establish that (1) defendant intentionally arrested him or had him arrested; (2) plaintiff was aware of the arrest; (3) plaintiff did not consent to the arrest; and (4) the arrest was not supported by probable cause.  Singer v. Fulton County Sheriff, 63 F.3d 110, 118 (2d Cir. 1995).

The existence of probable cause to arrest constitutes justification and "is a complete defense to an action for false arrest."  Bernard v. United States, 25 F.3d 98, 102 (2d Cir. 1994).  Probable cause "to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime."  Weyant, 101 F.3d at 852.  "[P]robable cause does not require an officer to be certain that subsequent prosecution of the arrestee will be successful."  Krause v. Bennett, 887 F.2d 362, 371 (2d Cir. 1989).  A reviewing court must examine "those facts available to the officer at the time of the arrest and

immediately before it."  Lowth v. Town of Cheektowaga, 82 F.3d 563, 569 (2d Cir. 1996).

"[T]he issuance of a warrant by a neutral magistrate, which depends on a finding of probable cause, creates a presumption that it was objectively reasonable for the officers to believe that there was probable cause … and a plaintiff who argues that a warrant was issued on less than probable cause faces a heavy burden."  Golino v. New Haven, 950 F.2d 864, 870-71 (2d Cir. 1991).  Further, a reviewing court should pay great deference to the determination of a neutral magistrate that probable cause existed to issue a warrant.  United States v. Smith, 9 F.3d 1007, 1012 (2d Cir. 1993). This right is violated when an "officer submitting the probable cause affidavit knowingly and intentionally, or with reckless disregard for the truth, made a false statement in his affidavit or omitted material information, and that such false or omitted information was necessary to the finding of probable cause."  Soares v. Connecticut, 8 F.3d 917, 920 (2d Cir. 1993).

## A.    May 18, 2006 Arrest

Plaintiff was arrested on May 18, 2006 and charged with Intimidation Based on Bigotry or Bias in the Second Degree.[5]

---

[5]    Conn. Gen. Stat. § 53a-181k provides, in relevant part: "A person is guilty of intimidation based on bigotry or bias in the second degree when such person maliciously, and with specific intent to intimidate or harass another person because of the actual or perceived race..., [or] ethnicity... of such other person, does any of the following: (1) Causes physical contact with such other person, (2) damages, destroys or defaces any real or personal property of such other person, or (3) threatens, by word or act, to do an act described in subdivision (1) or (2) of this subsection, if there is reasonable cause to believe that an act described in subdivision (1) or (2) of this subsection will occur."

Plaintiff was arrested pursuant to a valid arrest warrant issued by Superior Court Judge Strackbein. Plaintiff claims that probable cause was lacking because defendants Officers Garnett and Carter had failed to include in their warrant application the material fact that a witness had attempted to contact the officers. The Court assumes that his argument is that a judge with full information would not have issued the warrant. The officers in this case relied on the sworn statement of Ricky Cordero.

Plaintiff's argument is contrary to well-settled law. First, "police officers, when making a probable cause determination, are entitled to rely on the victims' allegations that a crime has been committed." Martinez v. Simonetti, 202 F.3d 625, 634 (2d Cir. 2000). Furthermore, a police officer may rely on hearsay in making a probable cause determination. See Illinois v. Gates, 462 U.S. 213 (1984); see also State v. Barton, 219 Conn. 529 (1991). Cordero's assertions reasonably support a finding even without a non-hearsay statement by Antonia Cordero that she feared plaintiff.

In addition, the police officers do not have a duty to investigate all potential exculpatory evidence and need not present all exculpatory evidence to the magistrate. See Panetta v. Crowley, 460 F.3d 388, 395-396 (2d Cir. 2006) ("[A]n officer's failure to investigate an arrestee's protestations of innocence generally does not vitiate probable cause...."); see also Curley v. Village of Suffern, 268 F.3d 65 (2d Cir. 2001) (finding probable cause even where criminal defendant offered conflicting account of events); Krause, 887 F.2d at 372 ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury."). In this case, in light of the allegations contained in Cordero's sworn statement, Officers Garnett and Carter reasonably believed that they had probable cause to arrest plaintiff.

14

Plaintiff has failed to meet his heavy burden to establish that the arrest warrant was issued on less than probable cause.

**B.    May 24, 2006**

Plaintiff was issued a summons for Breach of Peace[6] for the May 24, 2006 incident and was also charged with Intimidation Based on Bias or Bigotry related to this incident.  He was found not guilty by a jury of these charges.

Ricky Cordero's sworn statement regarding this incident can reasonably be read to support probable cause to issue a summons.  Cordero claimed that plaintiff punched him.  Such an allegation, if believed by Officer Nott, would support probable cause.  Plaintiff provides no argument that it was unreasonable for Officer Nott to trust Cordero's statement.  Instead, he argues that he was not permitted to present his side of the story.  As indicated above, failing to provide an arrestee with the opportunity to present his exculpatory evidence does not undermine a probable cause determination.  Summary judgment will enter on plaintiff's false arrest claim relating to this incident.

**C.    September 26, 2006**

Plaintiff was issued a summons on September 26, 2006 for Disorderly Conduct[7]

---

[6]    Conn. Gen. Stat. § 53a-181 provides in relevant part: "A person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior in a public place; or (2) assaults or strikes another; ... or (5) in a public place, uses abusive or obscene language or makes an obscene gesture...."

[7]    Conn. Gen. Stat. § 53a-182 provides in relevant part: "A person is guilty of disorderly conduct when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person: (1) Engages in fighting or in violent, tumultuous or threatening behavior; or (2) by offensive or disorderly conduct, annoys or interferes with another person; or (3) makes unreasonable noise...; or (5) obstructs

and Criminal Trespass in the Third Degree.[8]

The undisputed evidence in this matter shows that plaintiff entered Antonia Cordero's property, raised his hand at her and called her a "bitch" and a "dirty slut." Such evidence can reasonable support a finding of probable cause to issue a summons for the two offenses that plaintiff was charged with committing. Summary judgment will enter on plaintiff's false arrest claim for this incident as well.

**D. March 7, 2007**

As to the incident on March 7, 2007, the undisputed evidence shows that plaintiff spit upon Jose Pellot. This act supports a finding of probable cause for the offense of Breach of Peace. See Conn. Gen. Stat. § 53-181(a); see also State v. Hawley, 102 Conn. App. 551, 555 (2007) (ruling that spitting can constitute Breach of Peace). Any other exculpatory evidence is irrelevant at the probable cause stage.

**E. April 5, 2007 Incident**

On April 10, 2007, plaintiff was issued as misdemeanor summons for Disorderly Conduct for the incident on April 5. Plaintiff claims that he lacked an opportunity to provide an exculpatory statement that would have removed any indication of probable cause. As stated above, a criminal defendant need not be provided with a chance to make an exculpatory statement when probable cause is being determined. Based on

---

vehicular or pedestrian traffic...."

[8]     Conn. Gen. Stat. § 53a-109 provides in relevant part: "A person is guilty of criminal trespass in the third degree when, knowing that such person is not licensed or privileged to do so: (1) Such person enters or remains in premises which are posted in a manner prescribed by law or reasonably likely to come to the attention of intruders or are fenced or otherwise enclosed in a manner designed to exclude intruders...."

the undisputed facts, there was probable cause to support a charge of Disorderly Conduct.

Because there was probable cause that plaintiff had committed each alleged offense at the time of the summons, arrest or warrant, there can be no claims for false arrest. Summary judgment will be granted on these claims.

## II. First Amendment Claim

Plaintiff further claims that his First Amendment rights were violated by defendants' failure to follow-up on his repeated complaints and grievances to defendants as well as officers and employees of the City of New London.

The First Amendment protects the right "to petition the Government for a redress of grievances." U.S. Const. amend. I. The Second Circuit Court of Appeals has remarked that this right "in both judicial and administrative forums – is among the most precious of the liberties safeguarded by the Bill of Rights." Graham v. Henderson, 89 F.3d 75, 80 (2d Cir. 1996). Despite this, this Court has previously observed that:

> The right to petition government afforded by the First Amendment does not include the absolute right to speak in person to officials. Where written communications are considered by government officials, denial of a hearing does not infringe upon the right to petition. The right to petition government does not create in the government a corresponding duty to act.

Piscottano v. Town of Somers, 396 F. Supp. 2d 187, 206 (D. Conn. 2005).

Plaintiff has submitted an affidavit showing that he submitted his grievances to City of New London officials. As to the 2001 and 2003 NLPD complaints, such complaints were acted upon; plaintiff did not pursue any appeal to which he was entitled.

Plaintiff further claimed that he submitted complaints to Captains Michael Edwards, Dittman and Lacey from 2004 to 2008. These individuals are not defendants in this action, nor does plaintiff even allude to this conduct in his complaint. The Court will therefore dismiss this claim because plaintiff cannot amend his claim through a response to summary judgment. See Karath v. Bd. of Trs. of Tunxis Cmty. College, 2009 U.S. Dist. LEXIS 115026 (D. Conn. Dec. 10, 2009) (holding that plaintiff may not amend complaint by implication in response to a motion for summary judgment). Even if plaintiff properly asserted his claims in his complaint, plaintiff does not cite any law or precedent to support his claim that a refusal by NLPD officers to meet with him violates his First Amendment rights.

Finally, as to plaintiff's claims regarding his complaint after 2009, such allegations are beyond the scope of the complaint. The underlying allegations took place while this action was pending. In addition, plaintiff's complaints were received by the City officials. According to plaintiff's affidavit, his complaints were received; he simply was not permitted an in-person meeting with those officials. Such refusal is not actionable under the First Amendment. See Piscottano, 396 F. Supp. 2d at 206. Summary judgment is therefore appropriate as to plaintiff's First Amendment allegations.

III.    **Equal Protection Claims**

Plaintiff claims that he was treated differently from others similarly situated. He based this claim on a "class of one" theory. The Equal Protection Clause of the Fourteenth Amendment requires government actors to treat all persons similarly situated alike. See City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439

18

(1985).  Plaintiff may demonstrate an equal protection class of one violation by proving

that defendants intentionally treated him differently from others similarly situated and

that there is no rational basis for the difference in treatment.  Village of Willowbrook v.

Olech, 528 U.S. 562, 564 (2000).  Plaintiff must demonstrate (1) that no rational person

could regard the circumstances of plaintiff to differ from those of a comparator to a

degree that would justify the differential treatment on the basis of a legitimate

government policy; and (2) the similarity in circumstances and difference in treatment

are sufficient to exclude the possibility that defendants acted on the basis of a mistake.

Clubside, Inc. v. Valentin, 468 F.3d 144, 159 (2d Cir. 2006).  Plaintiff must also show

that the difference in treatment resulted from non-discretionary state action.  Engquist v.

Oregon Dep't of Agriculture, 553 U.S. 591, 128 S. Ct. 2146, 2154 (2008); Faulks v. City

of Hartford, 2010 U.S. Dist. LEXIS 3677, *21-22 (D. Conn. Jan. 19, 2010) (applying

Engquist to arrest case).

The crux of plaintiff's equal protection allegations is that the investigations

undertaken by the police officers responding to the various incidents were asymmetrical

insofar as the officers relied on one side of the story, ignored plaintiff and his

witness(es) and did not charge the other parties to the incident as they charged him.

The undisputed evidence permits a reasonable jury to conclude that there was a

rational basis for the different treatment by the police officers between plaintiff and the

other parties to the incidents.  Further, in many of the incidents, all parties were cited for

a crime.  Finally, plaintiff has proffered no evidence that defendants' actions were

anything but discretionary.  These allegations thus fail under Engquist.  Therefore,

plaintiff's equal protection claim will be dismissed as a reasonable jury could not

conclude that plaintiff was treated differently than others similarly situated without a rational basis.

## IV.    Qualified Immunity

Defendants argue that they are entitled to qualified immunity for their conduct. Qualified immunity shields government officials whose conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  The scope of qualified immunity is broad, and it protects "all but the plainly incompetent or those who knowingly violate the law." Malley v. Briggs, 475 U.S. 335, 341 (1986).

The test for qualified immunity is twofold.  The threshold question is whether, taken in the light most favorable to plaintiff, the facts demonstrate defendants' violations of plaintiff's rights under the Due Process Clause.  The next question is whether that right was clearly established within the specific context of the case.  In other words, the court must consider whether the constitutional right was clear enough so that a reasonable official would understand that her actions would violate that right. Saucier v. Katz, 533 U.S. 194, 201 (2001).  The Supreme Court recently held that applying the two prong test is no longer mandatory.  Instead, the lower courts "have the discretion to decide whether that procedure is worthwhile in particular cases." Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

Thus, a qualified immunity defense is established where "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." Tierney v. Davidson, 133 F.3d 189, 196 (2d Cir. 1998).

The doctrine of qualified immunity recognizes that "reasonable mistakes can be made as to the legal constraints on particular ... conduct." Saucier, 533 U.S. at 205. Qualified immunity applies if the official's mistake as to what the law requires is reasonable. Id. It does not apply if, on an objective basis, it is obvious that no reasonably competent official would have taken the actions of the alleged violation. Malley, 475 U.S. at 341. Summary judgment is appropriate when a trier of fact would find that reasonable officials could disagree. Lennon v. Miller, 66 F.3d 416, 421 (2d Cir. 1995).

If the court assumes, arguendo, that plaintiff's rights were violated, it becomes necessary to determine whether a clearly established right was violated by defendants' conduct. See Saucier, 533 U.S. at 207-08 ("[W]e will assume a constitutional violation could have occurred under the facts alleged..., then proceed to the question whether this general prohibition against excessive force was the source for clearly established law that was contravened in the circumstances this officer faced.").

Because the Court has concluded that there were no violations of plaintiff's right, it need not reach the issue of qualified immunity. In this case, however, even if plaintiff's right had been violated, qualified immunity would protect defendants' conduct. As to plaintiff's false arrest claims, reasonable officers could disagree about whether probable cause existed when plaintiff was issued a summons or was arrested. Therefore, qualified immunity protects defendants' conduct in arresting and issuing summons to plaintiff.

In addition, as to plaintiff's First Amendment claims, reasonable officers could disagree as to whether the officers' and officials' responses to plaintiff's complaint were

reasonable under settled law. Therefore, qualified immunity protects defendants' actions.

Finally, plaintiff's equal protections claims are similarly barred by defendants' qualified immunity. Reasonable officers could disagree as to whether the officers acted properly in responded to the various incidents.

**V.     Monell Claim**

A municipality is liable for deprivation of a citizen's rights pursuant to 42 U.S.C. § 983 "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. New York City Dep't of Social Servs, 436 U.S. 658, 694 (1978). A municipality may be held liable for inadequate training, supervision or hiring where the failure to train, hire or supervise amounts to deliberate indifference to the rights of those with whom municipal employees will come into contact. City of Canton v. Harris, 489 U.S. 378, 388 (1989).

There can be no claim against a municipality under Monell if there is no claim against the individual defendants. City of Los Angeles v. Heller, 475 U.S. 796, 799 (1986). Because the Court will grant summary judgment as to plaintiff's claims against the individual defendants, so too will it grant summary judgment on plaintiff's Monell claim.

**CONCLUSION**

For the foregoing reasons, the Court GRANTS defendants' motion for summary judgment (Doc. # 36) in its entirety. The Clerk is instructed to close this case.

Dated at Bridgeport, Connecticut, this __31st__ day of August, 2010.

_____/s/_____
Warren W. Eginton
Senior United States District Judge